# THOMAS ARNONE *v.* TOWN OF ENFIELD ET AL.
## (AC 22265)

Lavery, C. J., and Schaller and Dupont, Js.

Argued February 20—officially released September 23, 2003

*Michael C. Deakin,* with whom, on the brief, was *Peter T. Clark,* for the appellant (named defendant).

*Angelo Cicchiello,* with whom, on the brief, was *Stacy L. Buden,* for the appellee (plaintiff).

### Opinion

SCHALLER, J. The defendant[1] town of Enfield appeals from the judgment of the trial court, rendered after the jury's verdict, in favor of the plaintiff, Thomas Arnone. On appeal, the defendant claims that the court improperly (1) denied its motion to set aside the verdict, and (2) granted the plaintiff's motion for attorney's fees and costs associated with expert witness fees. We affirm in part and reverse in part the judgment of the trial court.

The jury reasonably could have found the following facts. From 1983 until 1996, the defendant employed the plaintiff in its water pollution control division. The plaintiff began his employment with the defendant as a laborer. By 1986, the plaintiff had been promoted to the position of a level two attendant.[2]

On June 14, 1995, the plaintiff filed a letter with the department of environmental protection (department), alleging that Marvin Serra, the superintendent of the

---

[1] In his complaint, the plaintiff named the town of Enfield and the town's water pollution control supervisor, Marvin Serra, as defendants. At the conclusion of the plaintiff's case-in-chief, the court granted the defendants' motion for a directed verdict with respect to Serra. We therefore refer in this opinion to the town of Enfield as the defendant.

[2] Generally, as a level one attendant, the plaintiff was responsible for conducting filter operation procedures. As an attendant level two, the plaintiff was responsible primarily for the maintenance of fourteen pump stations in addition to performing laboratory tests.

defendant's water pollution control division, ordered water pollution control division employees to alter sludge solid test results. The department referred the matter to the federal Environmental Protection Agency (federal agency). The federal agency investigated the allegations raised in the plaintiff's letter. The federal agency concluded that the reports filed by the water pollution control division did not violate federal reporting laws.

Following the plaintiff's submission of the letter to the department, the plaintiff was disciplined for allegedly failing to use good judgment, improperly hanging a windsock, insubordination and leaving work early. In response to those disciplinary actions, on February 28, 1996, the plaintiff filed a two count complaint, alleging, inter alia, that the defendant had violated General Statutes § 31-51m[3] by disciplining him in retaliation for his whistle-blowing activities and by intentionally inflicting emotional distress on him.

Approximately five months later, in July or August, 1996, the plaintiff and Eric McVickar, another level two attendant, were assigned to perform quarterly pump maintenance at the Indian Run and West Shore pumping stations. After the two men had performed the scheduled maintenance, Michael Merrill, one of the plaintiff's supervisors, discovered that pump switches at the subject stations had been returned to service improperly. The improper setting of those switches allegedly caused pump station failures. The defendant held a disciplinary hearing. John J. Kazmarski, the director of public works, and William E. Mahoney, the director of personnel for

---

[3] General Statutes § 31-51m (b) provides in relevant part: "No employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body . . . ."

the defendant, conducted that hearing. Kazmarski presided as the hearing officer. On the basis of the evidence presented during that hearing, Kazmarski and Mahoney determined that it was in the defendant's best interest to terminate the plaintiff's employment. The plaintiff's employment was terminated on August 30, 1996.

On May 22, 1997, the plaintiff filed a revised four count complaint, alleging, inter alia, that the defendant had (1) committed a retaliatory termination of his employment as a result of his whistle-blowing activities in violation of § 31-51m (count one), (2) subjected him to discharge on account of his exercise of protected rights guaranteed by the first amendment to the United States constitution and the constitution of Connecticut, article first, §§ 4 and 14, in violation of General Statutes § 31-51q[4] (count two), (3) intentionally caused him to suffer emotional distress (count three) and (4) negligently caused him to suffer emotional distress (count four).

Following trial, the jury returned a verdict in favor of the plaintiff on counts one and two. The jury found that the defendant had violated §§ 31-51m and 31-51q when it punished the plaintiff as a result of his whistle-blowing activities. The jury awarded the plaintiff $78,000 in back pay and benefits, $13,000 in lost future

[4] General Statutes § 31-51q provides: "An employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

pay and benefits, and $36,000 in punitive damages. The jury returned a verdict in favor of the defendant on the remaining emotional distress counts.

On February 13, 2001, the plaintiff filed a motion seeking attorney's fees and costs. On March 18, 2001, the defendant filed a motion to set aside the verdict. The court denied the defendant's motion to set aside the verdict. On July 30, 2001, the defendant filed a motion to extend the time to appeal, which the court granted on August 7, 2001. After conducting a hearing on the plaintiff's motion for attorney's fees and costs, on September 13, 2001, the court granted the plaintiff's motion in part.

The defendant filed an appeal from the denial of its motion to set aside the verdict on August 28, 2001. On October 3, 2001, the defendant filed an amended appeal to include the issue of the granting of the plaintiff's motion for attorney's fees and costs. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied its motion to set aside the verdict. Specifically, the defendant argues that the court should have granted the motion because (1) there was insufficient evidence establishing a retaliatory motive under §§ 31-51m and 31-51q, (2) there was insufficient evidence justifying an award of punitive damages and (3) the court improperly admitted testimony from a surprise expert witness on the issue of whether the plaintiff's whistle-blowing activity was made in good faith. We disagree.

At the outset, we must set forth the overarching standard of review. "[T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict . . . [is] the abuse of discretion standard. . . . In determin-

ing whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Internal quotation marks omitted.) *Bolmer* v. *McKulsky*, 74 Conn. App. 499, 510, 812 A.2d 869, cert. denied, 262 Conn. 954, 818 A.2d 780 (2003).

## A

The defendant first argues that there was insufficient evidence establishing a retaliatory motive under §§ 31-51m and 31-51q. Specifically, the defendant states that there was no causal link between the plaintiff's whistle-blowing activities and the subsequent termination of his employment because (1) the decision to terminate his employment was made by Kazmarski and Mahoney, two of the defendant's employees who were not associated with the defendant when the plaintiff filed his report with the department, (2) Kazmarski based his decision to terminate the plaintiff's employment on the plaintiff's involvement in two pump station failures, and (3) Kazmarski treated the plaintiff and McVickar, two similarly situated employees, in a similar manner. We are not persuaded.

Section 31-51q makes it illegal for an employer to discipline an employee in retaliation for the employee's exercise of rights under § 31-51m. Section 31-51m, in turn, protects the employee from retaliatory discharge when the employee has complained, in good faith,[5]

---

[5] On appeal, we note that the defendant does not challenge the jury's finding that the plaintiff reported suspected violations to the department in good faith.

about a suspected violation of state or federal law or regulation.

Such whistle-blowing claims for retaliatory discharge typically invite analysis under the framework first established in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802–804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "In an action under § 31-51m (b), [the] plaintiff has the initial burden under *McDonnell Douglas Corp. . . .* of proving by a preponderance of the evidence a prima facie case of retaliatory discharge. See *LaFond* v. *General Physics Services Corp.,* 50 F.3d 165, 172 (2d Cir. 1995) (holding that Connecticut courts would apply federal employment discrimination standards to a claim of retaliatory discharge under § 31-51m). This consists of three elements: (1) that [the plaintiff] engaged in a protected activity as defined by § 31-51m (b); (2) that [the plaintiff] was subsequently discharged from his employment; and (3) that there was a causal connection between his participation in the protected activity and his discharge." *Ritz* v. *East Hartford,* 110 F. Sup. 2d 94, 98 (D. Conn. 2000); see also *Beizer* v. *Dept. of Labor,* 56 Conn. App. 347, 355–56, 742 A.2d 821 (in retaliatory discharge actions, Connecticut courts look to federal courts to determine allocations of burdens of proof), cert. denied, 252 Conn. 937, 747 A.2d 1 (2000). Once the plaintiff has made a prima facie showing of a retaliatory discharge, the defendant is obligated to produce evidence that, if taken as true, would permit the conclusion that there was a nonretaliatory reason for the termination of employment. *Ritz* v. *East Hartford,* supra, 100. If the defendant provides a legitimate and nonretaliatory reason for the discharge, the plaintiff must offer some significantly probative evidence showing that the defendant's proffered reason is pretextual and that a retaliatory intention resulted in his discharge. See *Beizer* v. *Dept. of Labor,* supra, 356.

"The standards governing our review of a sufficiency of evidence claim are well established and rigorous. . . . [I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it. . . .

"We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation. . . . A motion to set aside the verdict should be granted if the jury reasonably and legally could not have reached the determination that [it] did in fact reach. . . . If the jury, without conjecture, could not have found a required element of the cause of action, it cannot withstand a motion to set aside the verdict." (Citations omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003).

The defendant specifically challenges the third element of the *McDonnell Douglas Corp.* test. We therefore limit our review of that sufficiency of the evidence claim to that element. To determine whether there was sufficient evidence to find a causal connection between the plaintiff's whistle-blowing activities and the subsequent termination of his employment, we must first conduct an exhaustive review of the relevant facts presented in this case.

During trial, the plaintiff presented testimony indicating that the termination of his employment resulted from a series of consistent and retaliatory actions on the part of the defendant. On the basis of those actions, the plaintiff claimed, and the jury agreed, that a causal connection between the whistle-blowing activity and the termination existed. Those incidents are outlined as follows.

## Chlorine Water Supply Pump Incident

On June 2, 1995, the plaintiff and his assistant, McVickar,[6] had been assigned to repair a chlorine injector pump at a water treatment station.[7] While repairing the pump, sewage water began flooding into the abatement area of the pump station where the plaintiff and McVickar were working.[8] The flooding created a serious

[6] At the time of the June 2, 1995 incident, the defendant employed McVickar as a level two attendant.

[7] We note that normally we must omit from consideration those episodes of harassment that preceded the plaintiff's protected activity, i.e., the workplace complaints and the lawsuit, because prior harassment could not have been in retaliation for acts not yet taken. In this case, however, the plaintiff contends that he received a warning with respect to the June 2, 1995 incident, following his whistle-blowing activities, which subsequently was used in consideration of the termination of his employment, for prior acts. Accordingly, we review the facts surrounding the June 2, 1995 incident.

[8] The plaintiff's specific assignment involved repairing the pump impeller. The impeller is the part of the pump mechanism that spins and forces water through a chlorine pump. The pump was purportedly off-line in preparation for the repair. The plaintiff and McVickar closed the inlet and outlet valves to seal off water from the impeller. When the plaintiff opened the drain valve to release the trapped water in the pump, "the water came shooting out like those valves weren't even closed at all." The plaintiff immediately shut the redundant valve above the pump, which caused the water to stop flowing. That resulted in the sounding of an alarm, and Serra responded. Following that incident, the assistant superintendent, Harold Anderson, informed the plaintiff and McVickar that the effluent bypass pump was being used to bypass the chlorine water pump and that there was no way for the plaintiff or McVickar to know that.

A meeting was held to discuss ways to avoid additional similar incidents. In a letter dated June 9, 1995, the plaintiff was warned for "failing to use good judgment in the performance of [his] duties." The plaintiff testified that prior to June 2, 1995, he had never received specific instructions about how to handle such a situation.

risk of electrical shock and contamination. To stop the flooding, the plaintiff turned the chlorine pump off, which, in turn, precluded hypochlorite solution from flowing into the effluent wastewater. The chlorine solution did not flow for five minutes. That caused an alarm to sound. The lack of chlorine flow did not, however, cause any damage. Following that incident, Serra issued a warning letter that reprimanded the plaintiff for failing to use good judgment and for allegedly creating a permit violation.[9]

## Plaintiff's Whistle-blowing Activity

On June 14, 1995, the plaintiff, by telephone and by letter, notified the department's bureau of water management that Serra had ordered Mike Dudek, a laboratory technician, to alter sludge solid test results at the Enfield wastewater treatment plant.[10] In turn, the department referred the matter to the federal agency. On July 12, 1995, the plaintiff met with representatives from the federal agency's criminal division to discuss his accusations. During the federal agency's inquiry, the federal agency did not find any reporting violations.

## Windsock Incident

Shortly after reporting those suspected violations, the plaintiff's immediate supervisor, Harold Anderson, instructed the plaintiff to hang a windsock. Anderson never complained about the manner in which the plaintiff hung the windsock. Two weeks later, however, Serra informed the plaintiff that the plaintiff had hung the windsock improperly because when the windsock hung

[9] Serra provided courtesy copies of the letter to Michael Dolen, personnel director; Daniel Vindigni, acting director of the public works department; Hank Anderson, supervisor; Keith Nutter, union steward; Merrill, assistant supervisor; and the plaintiff's file. Serra testified that the manner in which the letter was issued was inconsistent with company and union policies.

[10] Specifically, the plaintiff alleged that Serra had ordered Dudek to change the test results on the sludge solids for the week of June 5, 1995, from the 6 percent to 7 percent range to the 4 percent range.

limp, it draped around the top of the light post. Serra stated that this posed a danger because in the event of a chemical spill, the windsock would not effectively indicate the direction of the wind. The plaintiff rehung the windsock pursuant to Serra's orders. Serra did not issue a written or verbal warning, nor did the plaintiff incur suspended or docked pay as a result of that incident.[11]

## Insubordination Charge

The plaintiff took paid, scheduled vacation during the July 4, 1995 holiday weekend. On Saturday, July 1, the plaintiff was on his way to a family picnic when Serra telephoned. Serra informed the plaintiff that there was an emergency, and that the plaintiff was required to come into work and clear a blocked line. Serra offered the plaintiff overtime pay for the inconvenience. After the plaintiff declined the overtime pay and explained that he could not report to work, Serra accused the plaintiff of insubordination.

The plaintiff indicated that it was the custom and practice of the water pollution control division to contact less senior employees first concerning emergency or overtime work. The plaintiff was a senior level two attendant and, in light of the fact that he was the first person contacted, in addition to being on a scheduled vacation, he did not believe that he had a responsibility to report to work. Further, at no time in the past had the plaintiff been forced to report to work while he was on vacation under the threat of an insubordination charge. Upon returning to work on Wednesday, July 5, 1995, the plaintiff was told to return home on paid suspension.

[11] Although the plaintiff received no form of punishment for the windsock incident, it was used against him with respect to the July 4, 1995 insubordination charge. See footnote 13.

The following day, on July 6, 1995, the plaintiff reported to the Enfield town hall for a predisciplinary hearing.[12] The plaintiff received a five day, nonpaid suspension. Of the five days, three days were retroactive for the period when the plaintiff was on paid leave and two days were at the leisure of the defendant. Later that same day, Merrill came to the plaintiff's house and personally delivered a suspension letter. To bolster support for the suspension, the letter contained an attachment that listed the plaintiff's history of prior violations.[13]

### Grape Brook Pumping Station Incident

From October 10 through 12, 1995, the plaintiff and McVickar were assigned to repaint the pipes at the Grape Brook pumping station. Due to the confined working conditions, the plaintiff and McVickar wore respirators to avoid inhaling paint fumes. The two men found breathing through the respirators taxing. They had not received prior training on the proper use of the respirators. On the last day, the plaintiff and McVickar stopped painting one hour early, at 2 p.m., due to the difficult working conditions, fatigue and the need for more paint supplies. They decided to leave the pump station to finish their last hour of work at the plant. As

---

[12] Present at the meeting were Serra, Geoffrey R. McAlmond, assistant deputy director of public works, and two union representatives, Jeff Moore and Douglas Angers. The plaintiff indicated that McAlmond had acted in a hostile manner during the meeting.

[13] Attached to the suspension letter was a list of incidents wherein the plaintiff was accused of failing to follow directions. The listed incidents included: (1) May 22, 1995, when the plaintiff allegedly hung "no trespassing" signs improperly; (2) June 2, 1995, when the plaintiff allegedly shut down a chlorine water elimination pump improperly; (3) June 6, 1995, when the plaintiff allegedly painted over rusted stanchions instead of first removing rust prior to painting; (4) June 8, 1995, when the plaintiff hung a windsock improperly; (5) June 26, 1995, when, while installing a meter box, the plaintiff allegedly threw away good counters; and (6) August 20, 1991, when the plaintiff allegedly acted in a manner that supported a charge of insubordination.

they were leaving, Serra and Merrill appeared on site to check the progress of their work. Neither Serra nor Merrill indicated any disapproval of the early departure and, in fact, appeared even to acquiesce in the early departure. The plaintiff and McVickar returned to the plant, cleaned their tools, showered and left at 3:30 p.m., the normal end of the working day.

Serra and Merrill later alleged that the plaintiff and McVickar had left the work site early. On October 16, 1995, a predisciplinary meeting was held to discuss those allegations. During the meeting, it was the defendant's position that the plaintiff and McVickar had lied about running out of paint, and had used that lie as the basis for their early departure from the work site. The plaintiff received a letter on October 30, 1995, from Merrill, indicating that the plaintiff had been docked forty-five minutes from his pay and that he had been suspended for two days as a result of those actions.

### Indian Run and West Shore Incidents, July 30-August 6, 1996

On July 30, 1996, the plaintiff and McVickar were assigned to clean out the Indian Run pump station. The work involved switching over an on-line pump to an off-line pump. The plaintiff had performed that task routinely. The defendant did not have written procedures for switching over pumps. The plaintiff testified that he performed the switchover procedure as he had been instructed and watched the pot fire once.[14]

---

[14] The employees referred to the procedure that the plaintiff was assigned to perform as "switch[ing] pots." The purpose of the procedure was to ensure that the sewer lines were clear so that wastewater could flow freely.

Dudek was called into work overtime on July 31, 1996, because, unbeknownst to the plaintiff, the Indian Run pump station required both pots to be fired instead of just one. The plaintiff had fired only one pot. The plaintiff was first informed of the two pot firing procedure by Serra one week following the incident.

Each pot fired only once after the plaintiff departed. The pump station began to fill with raw sewage. An alarm sounded. The station did not overflow with sewage because the proper authorities were notified and the station was pumped. When the pump station was inspected, the controlling switch was found in the incorrect position.[15]

From July 29 until August 15, 1996, neither Merrill nor Serra indicated dissatisfaction with the plaintiff regarding the Indian Run incident, nor did they inform the plaintiff that he would receive any form of discipline for the Indian Run events.

Ten days later, on August 9, 1996, the plaintiff and McVickar were assigned to clean the West Shore pump station. The defendant claims that when the two men departed, they failed to reactivate the pumps and alarms.[16] Consequently, sewage flowed into the pump station and resulted in the flooding of the basement of a nearby home. The home's sump pump redirected the sewage to a nearby pond. Despite the fact that there existed no written procedures or formalized process for the labor that the plaintiff and McVickar performed, the two men were accused of negligently performing their work duties.

Geoffrey R. McAlmond, assistant deputy director of public works, notified the director of public works,

[15] During trial, the plaintiff testified that he believed that the switch could have been jostled into the incorrect position as a result of system vibrations. There was significant testimony regarding the position and how the valve could have moved on its own.

[16] Although the plaintiff does not challenge the fact that he failed to turn the pump and alarms back on, the parties presented conflicting evidence concerning whether someone else had turned them on. The plaintiff speculated that because the average working time for each pump on a normal day of operation equated to approximately 0.6 hours per day and that the pump had in fact operated for 0.6 hours, the pump had remained on through at least Saturday. The defendant claims, however, that the 0.6 hours of operation relied on by the plaintiff actually occurred before he arrived to clean the pump on Friday.

Kazmarski, about the incidents. Kazmarski ordered McAlmond and Serra to conduct an investigation. On August 15, 1996, the plaintiff was informed that an investigative meeting was being held to determine whether he and McVickar negligently had performed the pump maintenance causing the pump station failures.

The defendant held a predisciplinary hearing from August 27 through August 30, 1996. Presiding at the hearing were Kazmarski and Mahoney. The plaintiff continued to work during that time. During the hearing, the plaintiff stated that for the ten years prior to the Indian Run and West Shore incidents, he had never received any form of discipline for leaving a switch in the incorrect position ("on" or "off") at a pumping station. The plaintiff also indicated that he had performed that operation "hundreds of times." Evidence was provided concerning previous security concerns at the pumping stations because pump station doors had been discovered unlocked, and open, on three prior occasions.

On August 30, 1996, Merrill instructed the plaintiff to report to Serra's office. When the plaintiff arrived at Serra's office, the plaintiff was greeted by two police officers. Serra handed the plaintiff a letter. The letter stated that Kazmarski had lost all faith in the plaintiff's work and that the plaintiff's employment was terminated.

McVickar's employment, however, was not terminated in response to the findings at the hearing.[17] Instead, McVickar was demoted to a level one attendant status, received a thirty day suspension and was warned

[17] Kazmarski concluded that the plaintiff solely was responsible for the pump station failure at Indian Run because McVickar was above ground when the pump was supposed to be reactivated. McVickar's role was to pull the plaintiff out of the confines of the underground system in case of an emergency.

that any subsequent misconduct would result in the termination of his employment. McVickar's employment was terminated six months later for his involvement with another pump station failure.

Ruling on the defendant's motion to set aside the verdict, the court noted that it did not find that the causal connection was so lacking in the evidence as to justify the setting aside of the verdict. First, the court stated that it could not find that the jury's decision was so unreasonable as to suggest a mistake or unreasonable consideration. The court noted that inferences could be drawn as to the decision makers' partial reliance on Serra for information and their knowledge of this lawsuit, at a minimum, and their overreacting, in the plaintiff's view, to the plaintiff's minimal transgressions. The court stated that although it recognized that the temporal connection between the plaintiff's complaint and the disciplinary actions were not particularly strong, it nevertheless weighed heavily the jury's consideration that the plaintiff's employment was terminated only fifteen months after the complaint was made. Finally, the court noted that McVickar had received similar, but not identical, treatment to that of the plaintiff.

1

We are not persuaded by the argument that Kazmarski and Mahoney were not associated with the defendant when the plaintiff filed his report with the department and that such facts preclude a finding of a causal connection between the plaintiff's whistle-blowing activities and the termination of his employment. Our review of the record indicates that both Kazmarski and Mahoney learned of the plaintiff's report to the department in February, 1996. The predisciplinary hearing that resulted in the termination of the plaintiff's employment occurred on August 27, 1996, more than

one year after Kazmarski was hired as the director of public works, and approximately six months after Kazmarski and Mahoney had learned of the report. Kazmarski indicated that he had delegated the day-to-day management of the attendants to Serra. He also testified that outside of Serra's reports to him, he had no independent impression of the plaintiff's job performance. Therefore, regardless of when Kazmarski was hired, Kazmarski would have relied on Serra's potentially skewed impression of the plaintiff's work performance and could have been informed, by Serra and Mahoney, of the plaintiff's letter to the department.

2

We also are not persuaded that Kazmarski based his decision to terminate the plaintiff's employment solely on the plaintiff's involvement in two pump station failures. The mere fact that Serra was not involved in pre-disciplinary hearings related to the Indian Run and West Shore pumping incidents did not preclude the jury from reasonably concluding that Serra had *influenced* Kazmarski's decision. Again, Kazmarski stated that although he was the director of public works, he had left the control and management of the operation to Serra. Kazmarski also stated that he could not from "firsthand" or "personal" knowledge say whether the plaintiff was a good or bad employee and that his impression of the plaintiff's job performance was based solely on what others, such as Serra, had reported to him.

Second, in his letter to the plaintiff, dated August 30, 1996, Kazmarski stated that the basis of his decision to terminate the plaintiff's employment was "[a]s a result of [the plaintiff's] previous *suspensions* and [the plaintiff's] current failure to perform the necessary functions of [his] position . . . ." (Emphasis added.) In the letter, Kazmarski specifically referred to the following suspensions: (1) the July 7, 1995 claim of insubordination; and

(2) the October 12, 1995 claim of the plaintiff's alleged early work departure. Both of those suspensions involved incidents reported by Serra, the individual whom the plaintiff had accused of violating reporting requirements. Additionally, one of the two suspensions occurred on July 7, 1995, approximately one month before Kazmarski was hired as the director of public works, and the suspension, following a hearing in which Serra testified, derived from an insubordination charge brought by Serra himself.

As stated previously, with respect to the July 7, 1995 insubordination charge, Serra relied on six incidents, each one occurring within one month of the plaintiff's whistle-blowing activity. Those incidents were highly contested during the trial. Specifically, we note that one of those incidents, the windsock incident, did not result in any form of discipline or warning. With respect to the chlorine pump incident, the warning letter reprimanding the plaintiff for the accident was allegedly backdated to coincide with a date prior to the plaintiff's letter to the department. Finally, the meter box incident was never investigated and also involved another employee.

On the basis of those facts, and those stated previously, we disagree that Kazmarski based his decision to terminate the plaintiff's employment solely on the Indian Run and West Shore incidents. Instead, we conclude that he significantly relied on incidents involving, and reported by, Serra.

3

Finally, we are not persuaded that Kazmarski treated two similarly situated employees, the plaintiff and McVickar, in a similar manner. The distinguishing factor between the plaintiff and McVickar was the plaintiff's involvement in the West Shore incident. The defendant claimed that the plaintiff ultimately was responsible

for that incident and that the resulting harm caused environmental damage. At trial, however, the defendant admitted that it had no conclusive evidence that the West Shore incident resulted in environmental contamination, the principle reason for labeling that a "serious" incident. Instead, the defendant stated that "[t]here was no damage to the environment, but the environment may have been damaged if it wasn't caught in time." Despite also being involved in the West Shore incident, McVickar was offered a last chance agreement to work with the defendant. When McVickar's employment with the defendant ultimately was terminated six months later, his termination letter stated that "you and your partner [the plaintiff] left the West Shore pump station . . . without turning on the pumps or the alarm." That letter appears to have attributed negligence jointly to the plaintiff and to McVickar, both level two attendants, yet McVickar was given a warning and thirty day suspension for his role in the West Shore incident.

Additionally, Kazmarski also noted in the plaintiff's termination letter that the plaintiff previously had been issued three warnings. Those warnings concerned: (1) an accident with a jet truck; (2) an August 20, 1991 insubordination charge; and (3) the June 9, 1995 chlorine pump incident. Kazmarski noted that the existence of those warnings did not help to "progress" discipline, but that they did not help to mitigate discipline in the plaintiff's case. In other words, had those warnings not been issued, the plaintiff may have been treated in a manner comparable to McVickar.

With respect to the jet truck incident, the plaintiff caused damage to an automobile's bumper while driving a jet truck. The plaintiff testified that he had just received his license and was an inexperienced driver. He received a warning for that incident. The plaintiff also received a warning related to an insubordination incident occurring on August 20, 1991. The plaintiff

testified that he engaged in a "heated" discussion with his supervisor concerning the plaintiff's ability to perform electrical work as opposed to hiring an outside contractor. The plaintiff testified that this incident was *removed* from his record.

Finally, with respect to the June, 1995 pump incident, we note that the plaintiff testified that this incident was reported by Serra following the plaintiff's whistleblowing activities and that the report purportedly was backdated. We also note that the plaintiff testified that the verbal warning was issued nine days following the informational meeting compared to the standard two day period. Finally, the plaintiff testified that he turned the pump off to avoid serious injury and never had been trained to handle such a situation. On the basis of that testimony, the jury reasonably could have concluded that Kazmarski was improperly influenced by Serra's reports and, consequently, failed to treat the two men in a similar manner.

We agree with the court. The jury reasonably could have concluded, on the basis of those two suspensions, that in conjunction with the highly contested West Shore and Indian Run incidents, the defendant had terminated the plaintiff's employment in violation of §§ 31-51m and 31-51q. The defendant's motion to set aside the verdict on the basis of that argument was denied properly.

B

The defendant argues that there was insufficient evidence justifying an award of punitive damages against the defendant. In particular, the defendant states that the court improperly awarded punitive damages because the plaintiff failed to offer evidence that the defendant had (1) exhibited outrageous conduct, (2) acted with reckless indifference, (3) engaged in any intentional act to violate the plaintiff's rights, (4) fabri-

cated the stories against the plaintiff or (5) harbored ill will against the plaintiff. We disagree.

Section 31-51q allows for the imposition of punitive damages if an employer disciplines or discharges an employee because of the employee's exercise of constitutionally protected rights. The jury found that the defendant had punished the plaintiff for exercising his rights and awarded him punitive damages in the amount of $36,000. Section 31-51q does not embody a specific test to determine the awarding of punitive damages. We therefore defer to the common-law test.

"We have previously held that in order to award punitive damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . Whether the defendant acted recklessly is a question of fact subject to the clearly erroneous standard of review. (Citations omitted; internal quotation marks omitted.) *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 137–38, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002).

The court, in its memorandum of decision denying the motion to set aside the verdict, upheld the punitive damages award and cited the following reasons as the basis of its decision: (1) although they may not have

been employed at the time of the plaintiff's whistle-blowing activities, the decision makers were aware of the plaintiff's complaint to the department; (2) a letter from the plaintiff's attorney was received in 1995, and, by 1996, this action had been served on the defendant; (3) and the amount of punitive damages indicated that the jury was not emotionally swayed in reaching its conclusion. On the basis of that evidence, the court held that "it [was] not entirely unreasonable to conclude that the decision makers were acting [with] an improper motive [or] with a reckless indifference to the constitutionally protected rights of the plaintiff."

On the basis of our previous comprehensive review of the relevant facts, we conclude that the jury reasonably could have concluded that the defendant recklessly violated the plaintiff's protections under §§ 31-51m and 31-51q. Specifically, we note that the jury reasonably could have concluded that the defendant treated similarly situated employees dissimilarly and based its decision to terminate the plaintiff's employment solely on the reports of Serra. An award of punitive damages is discretionary, and "the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Tang* v. *Bou-Fakhreddine*, 75 Conn. App. 334, 339, 815 A.2d 1276 (2003); see *Sturman* v. *Socha*, 191 Conn. 1, 7, 463 A.2d 527 (1983).

On the basis of the facts in the present case, the court properly concluded that the evidence was sufficient to support the punitive damages award, a decision that was not clearly erroneous. Accordingly, the court properly denied the motion to set aside the verdict on the basis of that argument.

C

Finally, the defendant argues that the court improperly admitted testimony from a surprise expert witness

on the issue of whether the plaintiff's whistle-blowing activity was made in good faith. In support of its argument, the defendant states that William Hogan provided opinion testimony as an expert witness, and, because the plaintiff had failed to disclose Hogan as an expert properly, pursuant to Practice Book § 13-4,[18] the testimony prejudiced the defendant. We are not persuaded.

The court permitted Hogan, a municipal facilities engineer with the department, to testify about the standard reporting methods in wastewater laboratories and the process involved in correcting a reporting error.[19]

---

[18] Practice Book § 13-4 provides in relevant part: "(4) In addition to and notwithstanding the provisions of subdivisions (1), (2) and (3) of this rule, any plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . ."

[19] The following testimony in relevant part transpired on January 25, 2001, during the examination of Hogan:

"[The Plaintiff's Counsel]: Sir, what practices were followed to your knowledge in 1995 in the reporting of test results in the laboratory?

"[The Defendant's Counsel]: For the record, Your Honor, objection.

"The Court: I understand, but for the record I'll overrule it.

"[The Defendant's Counsel]: Thank you.

"[The Witness]: When you refer to practices for reporting, I'll start by saying that there were two forms that are filed by the municipal under their . . . permit. One is called discharge monitoring report, and the second report is a monthly operating report. The monthly operating report is more expansive than the discharge monitoring report, and it covers all laboratory tests that were conducted during the course of the preceding month at the wastewater laboratory—at a wastewater treatment plant, and it is a submission of a summary of all of the records of those tests [that] are legally reported to the department by that form.

"[The Plaintiff's Counsel]: All right. And what practices to your knowledge were used in reporting laboratory test results or analysis results?

"[The Witness]: Well, there are two. Actually, what we call bench lab notes, which is what the analyst in the wastewater laboratory will take as they are conducting the tests, writing down either their procedures that they follow, sample volume, calculations that they would do in the laboratory, and then there is the formal monthly operation report form, and so we would have—our wastewater laboratory inspector would be routinely reviewing those procedures at the wastewater treatment plants when that individual made his inspections at the plants.

During Hogan's testimony, the defendant objected on

"[The Plaintiff's Counsel]: All right. What practices were in effect in 1995 to your knowledge with respect to the reporting of a specific daily result, test result? The actual number, what—once you received a result of a particular test, what do you do with that number?

"[The Witness]: When they are received at the department of environmental protection?

"[The Plaintiff's Counsel]: No, no, in the lab, the laboratory?

"[The Witness]: In the laboratory, there would be lab manuals, daily manuals; analyst is conducting the actual analysis.

"[The Plaintiff's Counsel]: And you would receive a result of a particular analysis, and what do you do with that data?

"[The Witness]: The analyst would record a final number on the monthly operating report form.

"[The Plaintiff's Counsel]: All right. What would he do in that data with the daily report, the daily form?

"[The Witness]: The specific final test results would be transcribed from the lab bench sheets to that monthly operating report at the end of the day.

"[The Plaintiff's Counsel]: All right. Now, in the event that the lab technician or anyone within the lab determines that that test or analysis result is not reliable, what is the next step?

"[The Defendant's Counsel]: Expert opinion, Your Honor.

"The Court: Well, again, if we confine it to what—to Mr. Hogan's knowledge [of] what the practice was. We don't want any should have been kind of testimony.

"[The Plaintiff's Counsel]: These questions, sir, are solely asked as to the practice that you knew that was being followed in the laboratory.

"[The Witness]: The practice as I understand it is that an operator or analyst, if they made an error in entry in either their bench notes or in transcribing from bench notes to the final [monthly operating report], formal monthly operating report form, if they had made an error, they are to cross out in a single line the incorrect entry and then initial that change and then enter the correct information so that there is a record that something was in error first entered and then corrected.

"[The Plaintiff's Counsel]: All right. What was the practice in 1995 to your knowledge as to how you arrived at a second analysis if you determined that the first analysis was wrong for some reason?

"[The Witness]: If you were to—in order to arrive at a second number, you would have to conduct a second analysis. There is no other way around that. You would have to conduct a second analysis to generate a second number.

"[The Plaintiff's Counsel]: Okay. And if you—let me use an example. If you determine at 12:00 on a particular date—if the lab technician determines, determines at 12:00 which would have been—this is an assumption—that that was the time of testing results, 12:00, and at that point he decides, determines that it is not a reliable number and he followed the procedure

the ground that Hogan was testifying in the capacity of

as you just testified [about] with relation to 12:00. When would the second test be conducted based on the practices in the laboratory?

"[The Defendant's Counsel]: Your Honor, objection.

"The Court: Is the question, what is the practice for timing on a—

"[The Plaintiff's Counsel]: Timing a second test.

"The Court: If he can answer just what is the practice for timing a second test, that would get out of the hypothetical area. Can you answer that, sir?

"[The Witness]: Yes, I can answer that.

"The Court: What is the answer as to the practice on timing the second test?

"[The Witness]: The timing would be dependent upon the actual test in question. If it was a test that could be done promptly and you had an existing sample volume to retest with, then it would be expected that it would be done right at that moment.

"[The Plaintiff's Counsel]: All right. . . . Was there a practice in place in 1995 that you are aware of where a lab technician would take an average of the previous week to enter data of a second test?

"[The Defendant's Counsel]: Your Honor, this has gone way beyond the scope of your ruling as to what this witness could testify to. It was limited to reporting practices of reporting requirements, if any, not what a lab tech can or may or should do under varying circumstances.

"The Court: I think the last question gets in the area of opinion testimony, which has not been disclosed, so I'll sustain the objection to the last question.

"[The Plaintiff's Counsel]: Okay. . . . In the—what was the practice in place in 1995 to your knowledge when you had the original data of the test results, which you testified you would cross it [out] and do a second analysis and enter the data; what was the practice in place in reporting those two results to the state?

"[The Witness]: Both results would have to be submitted to the state on the monthly operating report form.

"[The Plaintiff's Counsel]: And if one result was reported to the state, what would that mean?

"[The Defendant's Counsel]: Objection, Your Honor.

"[The Plaintiff's Counsel]: Was there a practice that [was] allowed or permitted in the laboratory that would have allowed only one result reported to the state?

"[The Witness]: The practice would be that both results would be submitted to the state.

"[The Plaintiff's Counsel]: And would you explain how those two results would be reported to the state?

"[The Witness]: They would be both listed on the monthly operating report form. There is a comment section on the monthly operating report form where the analyst is able to enter additional information beyond just raw numbers with explanations and, on that particular comment section, they could note that they felt that one of the lab entries was done incorrectly or a mistake was made in transcribing it, and they could so explain that on the comment form.

an expert without having been previously disclosed as such. The court permitted Hogan to testify, but prohibited him from expressing any expert opinion. The court, therefore, permitted only factual evidence as to agency reporting practices. In its memorandum of decision on the defendant's motion to set aside the verdict, concerning the argument that Hogan had testified impermissibly, the court relied on *Opotzner* v. *Bass*, 63 Conn. App. 555, 567–69, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001), cert. denied, 259 Conn. 930, 793 A.2d 1086 (2002),[20] to support its prior ruling.

"We review evidentiary claims pursuant to an abuse of discretion standard. Generally, [t]rial courts have wide discretion with regard to evidentiary issues and their rulings will be reversed only if there has been an abuse of discretion or a manifest injustice appears to have occurred. . . . Every reasonable presumption will be made in favor of upholding the trial court's ruling, and it will be overturned only for a manifest

---

"[The Plaintiff's Counsel]: And that would be the monthly test submitted to the state?

"[The Witness]: That would be in the monthly operating report form.

"[The Plaintiff's Counsel]: Nothing further."

[20] In *Opotzner*, the plaintiffs claimed on appeal that the trial court had abused its discretion by redacting portions of a medical report, prepared by a previously disclosed expert witness. *Opotzner* v. *Bass*, supra, 63 Conn. App. 566–67. Prior to trial, the plaintiffs disclosed that the medical expert would testify concerning pain and joint injuries relative to the motor vehicle collision at issue. Id., 567. On the eve of trial, the plaintiffs disclosed that they would seek to introduce the recently produced report by the medical expert to include evidence of traumatic brain injury and depression. Id. The defendant lessor of one of the vehicles involved in the collision filed a motion in limine, arguing that it would be prejudiced by the report because it would not have had an opportunity to depose the expert or to subject the expert to cross-examination. Id. The court denied the motion and admitted the report. Id., 567–68. The court, however, redacted those portions of the report in which the expert offered his opinion. Id., 568. That is, the court permitted the admission of only facts contained in the report. On appeal, we concluded that the court had not abused its discretion by admitting facts offered by the expert, but not his opinions. Id., 569.

abuse of discretion." (Internal quotation marks omitted.) *Stanley* v. *Lincoln*, 75 Conn. App. 781, 785, 818 A.2d 783 (2003). We must, therefore, first determine the capacity in which Hogan testified before turning to the second issue that concerns whether the court improperly permitted Hogan's testimony without prior disclosure of Hogan as an expert.

A lay witness provides facts that are within his personal knowledge without providing his opinion concerning such facts. The test for determining whether a witness is an expert is whether the witness has any peculiar knowledge or experience, not common to the world, that renders his *opinion* of assistance to the trier of fact. See *Jaffe* v. *State Dept. of Health*, 135 Conn. 339, 348, 64 A.2d 330 (1949). The test for expert testimony, then, requires (1) whether the witness has peculiar knowledge or experience; *LePage* v. *Horne*, 262 Conn. 116, 125, 809 A.2d 505 (2002); and (2) whether that knowledge or experience renders his *opinion* of assistance to the trier of fact.

At oral argument, the defendant stated that Hogan testified regarding his opinion that the monthly sludge reports should have contained the original test results as well as the changed test results, and that such testimony is expert testimony because it is beyond the common knowledge of the jurors. Despite the fact that agency reporting procedures may be beyond the knowledge of ordinary jurors, that, in and of itself, did not make the substance of Hogan's testimony, expert *opinion* testimony. Instead, we conclude that Hogan, an expert in the field of reporting procedures, offered only *fact* testimony. To become expert opinion testimony, Hogan's testimony would have to have expressed an opinion about the defendant's reporting methods in light of the procedures normally employed by the agency. Our review of Hogan's testimony indicates that the plaintiff's counsel relied on Hogan's testimony to

inform the jury only of the regular reporting procedures so that the jury could independently conclude that the test reports were not submitted properly. That is not to say that Hogan, himself, expressed that opinion. Accordingly, we conclude that because Hogan did not give any opinion testimony, he could not be considered an expert witness under the test we have articulated in this opinion.

Still, although we conclude that Hogan provided only fact testimony, the defendant argues that Practice Book § 13-4 (4) required disclosure in this instance.[21] Practice Book § 13-4 (4) imposes a duty on a plaintiff to disclose the name of any expert expected to be called at trial, the subject matter of the testimony, the substance of facts and opinions, and a summary of the grounds for each opinion to be expressed during trial. Failure to comply with that rule may result in the preclusion of such expert testimony; however, an undisclosed expert may testify as long as the late disclosure does not cause undue prejudice, undue interference with the orderly progress of the trial or involve bad faith delay of disclosure. See Practice Book § 13-4 (4).

In this case, the court exercised its discretion and precluded any opinion testimony by Hogan while still permitting factual testimony. We conclude that the court did not abuse its discretion under the circumstances. Importantly, the defendant does not claim to be surprised that the plaintiff provided evidence concerning standard reporting procedures to prove that he had expressed his concerns to the department in good faith. The defendant cannot establish that the admission of Hogan's testimony disrupted the flow of the trial proceedings or that the plaintiff's nondisclosure was made in bad faith.

---

[21] "[A]ny plaintiff expecting to call an expert witness at trial shall disclose . . . the substance of the facts . . . to which the expert is expected to testify . . . ." Practice Book § 13-4 (4).

Instead, the defendant relies on *Cafro* v. *Brophy*, 62 Conn. App. 113, 774 A.2d 206, cert. denied, 256 Conn. 932, 776 A.2d 1149 (2001), to support its argument. In *Cafro*, the defendants claimed that the court improperly allowed an engineer, who had been retained by the plaintiffs and disclosed for the first time near the conclusion of the defendants' case in violation of Practice Book § 13-4 (4), to testify as an expert witness in the plaintiffs' rebuttal case. *Cafro* v. *Brophy*, supra, 117–18. The engineer testified as to his opinion that the structure at issue was defective, not compliant with appropriate building codes, and that it would have to be demolished from the second floor framing upward and rebuilt at a cost of $180,000. Id. In *Cafro*, we held that the trial court had abused its discretion because the expert testimony, by a previously undisclosed expert witness, "destroyed" the defendants' case where the testimony decided a hotly contested issue and the defendants could not otherwise prepare for such testimony. Id., 119.

*Cafro* is distinguishable on two grounds. First, if the issue of whether the plaintiff had a good faith belief that reports were being falsified was of such importance to his case, then, surely, the defendant would have known that he would discuss the standardized reporting procedures and could have prepared despite a lack of prior disclosure. Second, in contrast to the trial court in *Cafro*, the court in the present case did not permit the expert to give opinion testimony.

We conclude that because Hogan, a very knowledgeable witness on the issue of standardized reporting procedures, testified in the capacity of a fact witness, the court's admission of his testimony, despite the plaintiff's failure to disclose him pursuant to Practice Book § 13-4 (4), was not improper. The court properly denied the defendant's motion to set aside the verdict on the basis of that argument.

## II

The defendant's final claim is that the court improperly granted the plaintiff's motion for attorney's fees[22] and costs by awarding expert witness fees. Specifically, the defendant argues that the court should not have awarded $6479 in costs to the plaintiff for payment of expert witness fees because Arthur Wright, an economist, did not fall within the category of experts listed within General Statutes § 52-260 (f).[23] We agree.

In his motion for attorney's fees and costs, the plaintiff sought reimbursement, pursuant to §§ 31-51m and 31-51q, for $9380.77 in costs.[24] On September 13, 2001, the court awarded the plaintiff $6479.10 in costs associated with Wright's expert fees. The court framed the issue of costs as a question of whether the award is governed by the usual statutory standards of General Statutes §§ 52-257[25] and 52-260, or, instead, by the lan-

[22] The award by the court of attorney's fees in the amount of $42,333 is not contested by the defendant.

[23] General Statutes § 52-260 (f) provides: "When any practitioner of the healing arts, as defined in section 20-1, dentist, registered nurse, advanced practice registered nurse or licensed practical nurse, as defined in section 20-87a, or real estate appraiser gives expert testimony in any action or proceeding, including by means of a deposition, the court shall determine a reasonable fee to be paid to such practitioner of the healing arts, dentist, registered nurse, advanced practice registered nurse, licensed practical nurse or real estate appraiser and taxed as part of the costs in lieu of all other witness fees payable to such practitioner of the healing arts, dentist, registered nurse, advanced practice registered nurse, licensed practical nurse or real estate appraiser."

[24] The plaintiff's second amended bill of costs itemized the requested cost figure of $6479.10 for Wright's assistance as follows:

"11.Expert Witness-Arthur Wright$ 6,479.10

"(C.G.S. §31-51m)

"Invoices attached"

[25] General Statutes § 52-257 provides in relevant part: "(a) The fees of parties in civil actions in which the matter in demand is not less than fifteen thousand dollars shall be: For each complaint, exclusive of signing and bond, five dollars for the first page and, for each succeeding page, two dollars; for each judgment file, two dollars for the first page and, for each additional page, one dollar and fifty cents. . . .

"(b) Parties shall also receive: (1) For each witness attending court, his

guage of §§ 31-51m and 31-51q. The court concluded that because the legislature included the term "costs" in §§ 31-51m and 31-51q, in light of the existing, general civil taxable costs provisions of §§ 52-257 and 52-260, the legislature intended "something other than ordinary statutory taxable costs . . . ." The court also stated that "[t]he invoices submitted in support of the claim indicate that approximately half of the amount was for pretrial events and half for trial testimony. The defendant's only objection is on the ground that there is no statutory provision for the transfer of the cost; but, as noted [previously], [the court] believe[s] that §§ 31-51m and 31-51q contemplate the transfer of reasonably incurred costs to the successful plaintiff."

Section 31-51m allows for the awarding of costs.[26] The defendant argues that the award in this case was improper because § 31-51m does not define the term "costs" and because § 52-260, a statutory provision generally discussing witness fees as taxable costs in civil actions, limits expert witnesses to practitioners of the healing arts or real estate appraisers, but does not include economists.

It is a settled principle of our common law that parties are required to bear their own litigation expenses,

legal fee and mileage; (2) for each deposition taken out of the state, forty dollars, and for each deposition within the state, thirty dollars . . . (5) for maps, plans, mechanical drawings and photographs, necessary or convenient in the trial of any action, a reasonable sum; (6) for copies of records used in evidence, bonds, recognizances and subpoenas, court and clerk's fees . . . [and] (11) documented investigative costs and expenses, not exceeding the sum of two hundred dollars . . . ."

[26] General Statutes § 31-51m (c) provides in relevant part: "Any employee who is discharged, disciplined or otherwise penalized by his employer in violation of the provisions of subsection (b) may, after exhausting all available administrative remedies, bring a civil action . . . in the superior court for the judicial district where the violation is alleged to have occurred or where the employer has its principal office . . . . An employee's recovery from any such action shall be limited to such items, provided the court may allow to the prevailing party his *costs*, together with reasonable attorney's fees to be taxed by the court. . . ." (Emphasis added.)

except as otherwise provided by statute. See *Verrastro* v. *Sivertsen*, 188 Conn. 213, 217, 448 A.2d 1344 (1982). Because "[c]osts are the creature of statute . . . and unless the statute clearly provides for them courts cannot tax them." (Internal quotation marks omitted.) *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 814, 626 A.2d 729 (1993). Accordingly, the defendant can prevail only if the statutory provisions on which it relies clearly empower the trial court to tax the cost of the economist's testimony.

The defendant correctly notes that § 31-51m is silent as to the definition of "costs." Because we must determine whether §§ 31-51m and 31-51q apply, a question of law is involved, and our standard of review is plenary. Our review of the court's order granting the motion for attorney's fees and costs indicates that only half of the costs associated with the work performed by Wright involved trial testimony. We therefore recognize two separate issues: (1) whether the costs associated with out-of-court, nontestimonial activities of Wright were awarded properly; and (2) whether the costs associated with Wright's actual in-court testimony were awarded properly.

A

Nontestimonial Costs

We agree with the defendant that *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 674 A.2d 845 (1996), controls. In *M. DeMatteo Construction Co.*, the plaintiff contended that it was entitled to reimbursement for all reasonable appraisal fees incurred in connection with its successful tax appeal pursuant to, inter alia, General Statutes § 12-117a. *M. DeMatteo Construction Co.* v. *New London*, supra, 714. Specifically, the plaintiff sought reimbursement for an expert appraiser's report that was used in preparation for the expert's trial

testimony. Id. Our Supreme Court held that although § 12-117a provides for costs, it does not expressly identify appraisal reports as a type of reimbursable cost. Id., 716. The court also relied on the fact that where the legislature has intended the prevailing party to recover appraisal fees, it has expressly so provided in the statute. Id. Accordingly, the court determined that the general civil costs provisions of §§ 52-257 and 52-260 applied, and, because those provisions must be strictly construed and make no mention of appraisal reports, the fees were not allowed. Id., 717–18.

Similarly, § 31-51m allows for costs, but does not expressly provide for expert witness fees. Therefore, as was the case in *M. DeMatteo Construction Co.*, the general cost provisions apply, which do not mention nontestimonial costs. Because we construe those provisions narrowly, the nontestimonial work performed by the expert was not taxable as costs. See also *Ludington* v. *Sayers*, 64 Conn. App. 768, 780–81, 778 A.2d 262 (2001) (videotaped testimony by expert not equivalent to testimony by witness attending court as required by § 52-257 [b]).

B

Testimonial Costs

The plaintiff argues that because § 31-51m provides some discretion to the court to award costs, §§ 52-257 and 52-260 do not apply and the court correctly awarded costs associated with Wright's in-court testimony. The court agreed with that reasoning. In its memorandum of decision, the court stated that to construe the term "costs" in §§ 31-51m and 31-51q in the same manner as §§ 52-257 and 52-260 would be superfluous and give no meaning to the legislature's words. In light of *M. DeMatteo Construction Co.*, however, we disagree.

As does § 31-51m, § 12-117a,[27] the statute at issue in *M. DeMatteo Construction Co.*, permits taxation of costs at the discretion of the court. Section § 31-51m similarly is discretionary and provides that "the court *may* allow to the prevailing party his costs." Because our Supreme Court determined, in *M. DeMatteo Construction Co.*, that despite the discretionary language embodied in § 12-117a, the general costs provisions controlled, we conclude that the court's discretion to award costs under §§ 31-51m and 31-51q are discretionary within the bounds of the general provisions.

Our research has failed to identify any case in which § 31-51m "costs" are specifically defined. Considering the plain meaning of the term "costs," it is unclear whether the statute includes expert witness fees. Because the use of that word is ambiguous, we must look to the legislative history of the provision for additional guidance. Nothing in the legislative history indicates that the legislature's use of the term "costs" in either §§ 31-51m or 31-51q was intended to authorize the court to award to the prevailing party the cost of an economist. Although we agree that an economist may be a necessary witness in these types of cases, whether the plaintiff should bear the costs for such witnesses is an issue for the legislature.

An economist is not a listed expert witness whose cost may be reimbursed under § 52-260 (f). We therefore conclude that because Wright was an economist testifying in the capacity of an expert witness, the court was bound to award costs comporting with the requirements of § 52-260 (f), that is, costs awarded to an

[27] General Statutes § 12-117a provides in relevant part: "The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. . . ."

approved expert listed within the confines of § 52-260 (f). Consequently, Wright's fees cannot be reimbursed. See *Lurie & Associates, Inc.* v. *Tomik Corp.*, 37 Conn. App. 865, 868–69, 658 A.2d 146 (1995) (prevailing party only authorized to recover costs expressly authorized by statute and cost of handwriting expert not allowable under § 52-260).

The judgment is reversed only as to the award of expert witness fees in the amount of $6479.10 and the case is remanded with direction to recalculate the award of costs to the plaintiff consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.