******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# DANIEL PELLET ET AL. *v.* KELLER WILLIAMS REALTY CORPORATION ET AL.
## (AC 38236)

Prescott, Beach and Mihalakos, Js.

*Syllabus*

The plaintiff, as guardian for his brother, S, appealed to this court from the judgment of the trial court directing a verdict for the defendants, S's former real estate agents, the agents' employer and a broker, in connection with the sale of S's home to the defendant purchasers, K and her husband. The plaintiff claimed, inter alia, that the trial court improperly directed the verdict in favor of the defendants because it erroneously equated all of the allegations in his substitute complaint to claims of professional negligence and determined that, as such, they failed for lack of expert testimony as to the applicable standard of care. *Held*:

1. The trial court improperly directed a verdict for the defendants on the ground that all eight counts of the substitute complaint were based on breaches of professional standards of care regarding the selection and recommendation of the listing price for the plaintiff's home:

   a. Although all eight counts of the substitute complaint incorporated the allegations that the defendant real estate agents had set the list price for the property at $318,000, when they knew, or should have known, that the fair market value of the property was substantially greater, it did not necessarily follow that all of the counts summarily could be characterized as one general claim of professional negligence; the first count sounded in breach of contract, the claims in the second and third counts, which alleged the breach of a fiduciary duty of an agent and the breach of the implied covenant of good faith and fair dealing, stemmed from the contractual relationship between the parties, the entirety of the fourth count did not necessarily equate to a claim of professional negligence, as certain of its allegations did not require the use of specialized skills or professional judgment on the part of the defendants, the fifth and seventh counts, which alleged intentional misrepresentation and conspiracy to defraud, involved intentional rather than negligent action by the defendants, and did not involve the question of whether the defendants exercised the same degree of care as would a reasonably prudent real estate professional, the eighth count alleged acts against the defendants that could be construed as unfair or deceptive in nature, and the plaintiff's claim as to count six, which alleged negligent supervision, was deemed abandoned as inadequately briefed.

   b. The trial court improperly concluded that the plaintiff's failure to tender an expert witness resulted in a lack of evidence on the professional standard of care: although the plaintiff did not present expert testimony from a real estate agent or broker regarding the standard of care with respect to the allegations in the substitute complaint that were based on breaches of professional standards of care, such testimony was provided by the defendants through the testimony of two licensed real estate agents, and, therefore, the jury was provided with expert testimony as to the applicable standard of care required of real estate professionals; moreover, although those real estate agents did not expressly opine that the defendants had breached the standard of care and the expert testimony did not specifically come from the plaintiff, the jury had before it testimony from which it could have inferred that the standard of care was breached by the defendants.

2. The trial court improperly granted the defendants' motions for a special finding, pursuant to statute (§ 52-226a), that the plaintiff's action was brought without merit and in bad faith: because, with respect to the five defendants who participated in this appeal, the court's granting of their motion for a special finding pursuant to § 52-226a was tied directly to the merits of its granting of the motion for a directed verdict, which this court found to be improper, the trial court's special finding pursuant to § 52-226a could not stand with respect to those defendants; moreover, with respect to the motion for a special finding filed by K, who did not participate in this appeal, the court's ruling granting that motion lacked

a high degree of specificity in its findings, as the court did not analyze the counts of the substitute complaint as they applied to K, and did not indicate at which point in time it should have become clear to the plaintiff that the action against K was without merit.

Argued May 23—officially released October 10, 2017

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the action was withdrawn as against the defendant Ward Kilduff Mortgage Corporation; thereafter, the matter was tried to the jury before *Swienton, J.*; subsequently, the court granted the motion for a directed verdict filed by the named defendant et al. and rendered judgment for the named defendant et al., from which the plaintiff appealed to this court; thereafter, the court granted the motions filed by the named defendant et al. for a special finding that the action was without merit and was not brought in good faith, and the plaintiff filed an amended appeal. *Reversed in part; new trial.*

*Austin Berescik-Johns*, with whom was *David V. DeRosa*, for the appellant (plaintiff).

*Michael C. Conroy*, for the appellees (named defendant et al.).

*Opinion*

PRESCOTT, J. The named plaintiff, Daniel Pellet, acting in his capacity as guardian for his brother, Stephen Pellet,[1] appeals from the judgment of the trial court directing a verdict in favor of the defendants Keller Williams Realty Corporation (Keller Williams), Michael Ladden, David Olson, Pina Jenkins, Jason Kilduff, and Kimberly Kilduff[2] as to all eight counts of the plaintiff's substitute complaint, and from the trial court's granting of the defendants' motions for a special finding pursuant to General Statutes § 52-226a.[3] The plaintiff argues that the court improperly (1) directed the verdict in favor of the defendants because it erroneously (a) equated all of the plaintiff's allegations to claims of professional negligence and (b) determined that, as such, they must fail for lack of expert testimony as to the applicable standard of care; and (2) found that the plaintiff brought the action without merit and in bad faith pursuant to § 52-226a. We reverse the judgment and special finding of the court, and remand the case for a new trial.

The following procedural history is relevant to this appeal, which arises out of the 2008 sale of 59 Paper Chase Trail in Avon (property) from Stephen Pellet to Kimberly Kilduff. The underlying action was commenced on September 9, 2011, against the defendants, who are Stephen Pellet's former real estate agents with respect to the sale of the property (Olson and Jenkins), the agents' employer/realty agency (Keller Williams), Keller Williams' broker of record (Ladden), and the spouse of Kimberly Kilduff, Jason Kilduff. In his eight count substitute complaint dated February 20, 2015, the plaintiff alleges the following claims: breach of contract, breach of fiduciary duty of an agent, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, intentional misrepresentation, negligent supervision, conspiracy to defraud, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

A jury trial commenced on July 8, 2015. On July 10, 2015, the defendants filed a written motion for a directed verdict, accompanied by a memorandum of law, and that same day, the plaintiff filed a memorandum of law in opposition.[4] On July 15, 2015, after the close of evidence in the trial but before the parties' closing arguments, the court, *Swienton, J.*, granted the defendants' motion for a directed verdict, ruling, in relevant part: "[T]he court has carefully considered the counts against the defendants, and viewed in the light most favorable to the plaintiff, the court grants the motion [for a] directed verdict as to all defendants on all counts. . . . I am going to state my reasons on the record at this time. . . .

"[Stephen Pellet] was the owner of property located at 59 Paper Chase Trail in Avon. The property was built

in 1971 and other than minor renovations had never been updated or renovated. Furthermore, the house was full of clutter. The defendants David Olson and Pina Jenkins, real estate salespersons affiliated with Keller Williams agency, were contacted by [Stephen Pellet] and [his brother] Daniel Pellet. The evidence showed that [Stephen Pellet] was anxious to sell the property and, further, that he wished to net $90,000 from the sale of the property. The listing price was established accordingly, after discussions with the realtors and [Stephen Pellet], and after the realtors performed a comparative market analysis, which was reviewed with and furnished to [Stephen Pellet]. A listing agreement was executed.

"Kimberly Kilduff learned from a neighbor that the property was being sold, and the real estate agents, Olson and Jenkins, were contacts. Olson and Jenkins, after obtaining permission from [Stephen Pellet] to show the house, showed the property to the defendants Kimberly Kilduff and Jason Kilduff. An offer was placed by Kimberly Kilduff, which was accepted, and the house was sold for $100 more than the listing price. [Stephen Pellet] netted almost $89,000. The buyers of the property,[5] the defendants Jason Kilduff and Kimberly Kilduff, performed extensive renovations to the property, exceeding some $100,000 in expenses. They subsequently sold the property for $462,000 and netted, in profits, approximately $16,000.[6]

"The operative complaint is in eight counts . . . . The underlying basis for each of these counts is based upon breaches of professional standards of care on the part of the real estate agent, broker, and salespersons regarding selection and recommendation of the listing price.

"In an action based upon professional negligence, expert testimony will be [required] if the determination of that standard of care requires knowledge that is beyond the experience of a normal fact finder . . . . [T]he plaintiff in this case has failed to produce any expert testimony and therefore fails on [his] burden of proof of negligence. . . . Although the plaintiff presented an expert in the field of appraisals, this does not satisfy the requirement of an expert to testify as to the standard of care of a realtor in the determination and recommendation of a listing price." (Footnotes added.) Judgment in favor of the defendants was rendered on that same day. On July 22, 2015, the defendants filed a motion for a special finding pursuant to § 52-226a, which the court granted on February 25, 2016.[7] This appeal followed.

As a preliminary matter, in reviewing the court's reasoning for granting the defendants' motion for a directed verdict, we highlight our concern with whether it applied the correct standard of review to the evidence presented at trial. "Directed verdicts are not favored.

. . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party. . . . This court has emphasized two additional points with respect to motions to set aside a verdict that are equally applicable to motions for a directed verdict: First, the plaintiff in a civil matter is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury." (Citation omitted; internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 856, 37 A.3d 700 (2012). This standard also requires the trial court to consider the evidence, including reasonable inferences, in the light most favorable to the plaintiff. *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, 115 Conn. App. 680, 693, 974 A.2d 764, cert. denied, 293 Conn. 916, 979 A.2d 488 (2009).

In the present case, it is not entirely clear from the record whether the court made findings of fact in ruling on the defendants' motion. As previously indicated, such findings would be improper in the context of a motion for a directed verdict, given that "litigants have a constitutional right to have factual issues resolved by the jury"; (internal quotation marks omitted) id.; and that the court must view the evidence in the light most favorable to the plaintiff.[8] Id. Although the court expressly stated that it "viewed [the evidence] in the light most favorable to the plaintiff," certain aspects of its decision suggest it did not.

For instance, the court stated at one point that it "cannot *find* that the defendants' actions were proven to be the proximate cause of the plaintiffs' harm." (Emphasis added.) Moreover, in its recitation of the evidence supporting its ruling, certain statements were clearly viewed in the light most favorable to the *defendants*, rather than to the plaintiff. For example, the court stated that "[t]he evidence showed that [Stephen Pellet] . . . wished to net $90,000 from the sale of the property," even though the plaintiff testified at trial that he and Stephen Pellet never told Olson and Jenkins that they wanted to make a specific profit from the sale of the property, instead desiring to "maximize" the profit to its fullest potential. The court also stated that Olson and Jenkins "obtain[ed] permission from [Stephen Pellet] to show the house . . . to . . . Kimberly Kilduff and Jason Kilduff," even though the plaintiff testified at trial to the contrary.

Accordingly, we conclude that the court, in fact, did not view all of the evidence in the light most favorable to the plaintiff, pursuant to the applicable standard of

review. Because the issue of "[w]hether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary";[9] *Curran* v. *Kroll*, supra, 303 Conn. 855; we need not afford deference to the court's recitation of evidence and exercise plenary review over the record in the present appeal. In conducting our review of the court's decision to direct a verdict in favor of the defendants, we, too, are required to view the evidence in the light most favorable to the plaintiff. See id., 856. Additional evidence and procedural history will be set forth as necessary to address the plaintiff's individual claims.

## I

### DIRECTED VERDICT

The plaintiff first claims on appeal that the court's directed verdict in favor of the defendants is fatally flawed in two respects: (1) the eight counts alleged by the plaintiff in his substitute complaint do not each equate to a claim of professional negligence; and (2) even if that were the case, the plaintiff's claims should not fail for lack of expert testimony presented at trial. In response, the defendants argue that each of the eight theories of recovery advanced in the plaintiff's complaint "centers upon the foundational allegation that the defendant realtors negligently or intentionally recommended a list price for the . . . property that was substantially below fair market value," and, thus, those eight theories of recovery presented, at their core, claims for professional negligence. As a result, the defendants argue, the plaintiff was required to present expert testimony to establish the applicable standard of care and any breach thereof, which he failed to do. We reject the defendants' arguments and agree with the plaintiff in both respects.

### A

### Professional Negligence

The plaintiff first argues that the court improperly concluded that "[t]he underlying basis for each of [the plaintiff's eight] counts is based upon breaches of professional standards of care on the part of the real estate agent, broker and salespersons regarding selection and recommendation of the listing price." Although all eight counts of the substitute complaint incorporate the allegation that Olson and Jenkins set the list price for the property at $318,000 when they knew, or should have known, that the fair market value of the property was, in fact, substantially greater, we agree with the plaintiff that it does not necessarily follow that all of the counts summarily can be characterized as one general claim of professional negligence.

"The interpretation of pleadings presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *Oxford House at Yale* v. *Gil-*

*ligan*, 125 Conn. App. 464, 469, 10 A.3d 52 (2010). Furthermore, "in determining the nature of a pleading filed by a party, we are not bound by the label affixed to that pleading by the party." (Internal quotation marks omitted.) *Selimoglu* v. *Phimvongsa*, 119 Conn. App. 645, 651–52, 989 A.2d 121, cert. denied, 296 Conn. 902, 991 A.2d 1103 (2010). "In order for a claim to sound in professional negligence, it must be alleged that (1) the defendant is sued in his or her capacity as a professional, (2) the alleged negligence is of a specialized professional nature that arises out of the professional relationship, and (3) the alleged negligence is substantially related to the professional conduct and involved the exercise of professional judgment." (Emphasis omitted.) *Cammarota* v. *Guerrera*, 148 Conn. App. 743, 748, 87 A.3d 1134, cert. denied, 311 Conn. 944, 90 A.3d 975 (2014).

1

Counts One, Two and Three

We first address whether counts one, two, and three of the substitute complaint, which sound, respectively, in breach of contract, breach of fiduciary duty of an agent, and breach of the implied covenant of good faith and fair dealing, are solely based on breaches of professional negligence. With regard to the first count, the plaintiff argues that because the breach of contract claim is directly tied to the terms of the written "exclusive right to sell listing contract" (listing contract) into which the parties entered, it, in fact, sounds in contract law rather than tort law.

"Whether [a] plaintiff's cause of action is one for malpractice [or contract] depends upon the definition of [those terms] and the allegations of the complaint. . . . Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services . . . . The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. . . . In other words, [a]n action in contract is for the breach of a duty arising out of a contract . . . [whereas] an action in tort is for a breach of duty imposed by law. . . .

"In determining whether a claim sounds in breach of contract or in tort, we are mindful of the well established principle that an independent claim of tortious conduct may arise in the context of a contractual relationship. . . . Accordingly, [for example] the fact that [a] contract . . . [may require a] defendant to provide [a] plaintiff with legal representation and that the plaintiff was dissatisfied with the defendant's performance

does not necessarily mean that her claim of improper representation sounds in breach of contract. . . .

"[W]e previously have concluded that a claim alleging that the defendant attorney violated the specific instructions of his client sounded in breach of contract. . . . Other Connecticut courts similarly have determined that an attorney's failure to comply with the specific provisions of a contract sounded in breach of contract. . . . Correspondingly, Connecticut courts have concluded that claims alleging that the defendant attorney had performed the required tasks but in a deficient manner sounded in tort rather than in contract. . . . The decisions in [such] cases are consistent with the well established principle that an action in tort is for a breach of duty imposed by law." (Citations omitted; internal quotation marks omitted.) *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291–95, 87 A.3d 534 (2014).

In the present case, count one of the plaintiff's substitute complaint alleges that Olson, Jenkins, Keller Williams, and Ladden breached the listing contract in the following ways: they "were not honest in their representation of the value of the property"; they "were not honest . . . in their role as dual or designated agents [for both the plaintiff and Kimberly Kilduff]"; they "showed the property before it was cleaned out"; they "showed the property without written permission"; they "did not make reasonable efforts to sell the property"; and they "did not exercise the degree of care, skill and expertise common to the profession."

In comparing the allegations in count one to the language of the listing contract, which was admitted into evidence at trial, the listing contract expressly provides that in the event the seller's agent becomes a dual agent for the property, thereby representing both the seller and the buyer, the agent "will promptly disclose all relevant information to [the seller] and give [the seller] any disclosure notices and consent agreements required by law, for my/our review and signature" (dual agency provision). It also expressly provides under "other terms" that the property is "on temp status till [the] seller gives written [e-mail] permission to put on active" (written permission provision).

Accordingly, in analyzing whether count one sounds in breach of contract, as the plaintiff asserts, or professional negligence, as the court concluded, it is clear that at least *some* of the particular allegations therein reference Olson's, Jenkins', Ladden's, and Keller Williams' failure to comply with the *specific provisions* of the listing contract, namely, the dual agency provision and the written permission provision. Under our case law, such allegations sound in breach of contract, not professional negligence. See *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, supra, 311 Conn. 292. In contrast, other allegations in count one that

reference these defendants' valuation of the property, their "reasonable efforts," and their "degree of care, skill and expertise," i.e., those that allege that the required tasks were performed but in a deficient manner, appear to sound in professional negligence rather than breach of contract.[10] See *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, supra, 294. Nevertheless, because the court summarily deemed the *entirety* of count one to be solely a claim of professional negligence, this was improper as a matter of law.[11]

Similarly, count two, which alleges breach of a fiduciary duty of an agent, and count three, which alleges breach of the implied covenant of good faith and fair dealing, are both claims that stem from the contractual relationship between the parties. With regard to count two, our Supreme Court has expressly held that "[p]rofessional negligence alone . . . does not give rise automatically to a claim for breach of fiduciary duty. . . . [Thus] not every instance of professional negligence results in a breach of [a] fiduciary duty. . . . Professional negligence implicates a duty of care, while breach of fiduciary duty implicates a duty of loyalty and honesty." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 196, 896 A.2d 777 (2006). Although professional negligence and breach of a fiduciary duty may arise from the same operative facts, they are not, legally speaking, one and the same claim. Thus, the court's determination that count two could be reduced merely to a claim of professional negligence was improper as a matter of law. Moreover, in reviewing the allegations contained in count two, the plaintiff clearly takes issue with Olson's, Jenkins', Ladden's, and Keller Williams' duty of loyalty and honesty by asserting, among other things, that these defendants had not disclosed conflicts of interest arising from their dual representation of both the plaintiff and Kimberly Kilduff or disclosed their preexisting outside relationships with Kimberly Kilduff and Jason Kilduff that predated the sale of the property.

With regard to count three, our Supreme Court has held that a claim brought pursuant to a contract, alleging a breach of the implied covenant of good faith and fair dealing, sounds in contract because "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. . . . To constitute a breach of [that duty], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Citation omitted; internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, 275 Conn. 309, 333–34, 880 A.2d 106 (2005). Thus, this claim falls under the umbrella of contract law and not tort law, under which professional negligence exists. Moreover, the plaintiff alleges in count three that Olson, Jenkins, Ladden, and Keller Williams acted in bad faith

in performing under the contract by, inter alia, not disclosing their divided loyalties between the plaintiff and Kimberly Kilduff in this transaction, and not disclosing other offers on the property. For these reasons, we conclude that the court improperly determined that count three equates to a claim of professional negligence.

### 2

### Count Four

We next address count four of the substitute complaint, which alleges negligent misrepresentation. "Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." (Internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 309 Conn. 342, 351–52, 71 A.3d 480 (2013). "The classification of a negligence claim as either [professional] malpractice or ordinary negligence requires a court to review closely the circumstances under which the alleged negligence occurred." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 562, 864 A.2d 1 (2005).

Here, count four of the substitute complaint alleges in relevant part that "the defendants, jointly and severally, negligently misrepresented, by commission and/or omission, the value of the subject property, the interest of other purchasers in the subject property, and the relationships among and between the defendants." Although the specific allegation that the defendants misrepresented the value of the property arguably sounds in professional negligence because the "alleged negligence is of a specialized professional nature" arising out of the client-real estate agent relationship and "involved the exercise of professional judgment"; (emphasis omitted) *Cammarota* v. *Guerrera*, supra, 148 Conn. App. 748; the remaining allegations contained in the count do not. If the defendants did, in fact, misrepresent, by omission, the fact that there were other purchasers interested in the property and that the defendants had long-standing, outside relationships with each other that predated the sale transaction of the property,[12] such allegations do not require the use of specialized skills or professional judgment on the part of the defendants. Accordingly, we disagree with the court that the entirety of count four necessarily equates to a claim of professional negligence.

### 3

### Counts Five and Seven

We next address counts five and seven together, which allege, respectively, intentional misrepresenta-

tion and conspiracy to defraud. With regard to the former, "[a] claim of intentional misrepresentation requires the same elements as negligent misrepresentation except that the plaintiff also must prove that the defendant made the misrepresentation to induce the other party to act upon it . . . ." (Footnote omitted; internal quotation marks omitted.) *Brown* v. *Otake*, 164 Conn. App. 686, 706, 138 A.3d 951 (2016). With regard to the latter, the "essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury"; (internal quotation marks omitted) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 142, 2 A.3d 859 (2010); and "[t]he [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 635–36, 894 A.2d 240 (2006).

In the present case, count five alleges in relevant part that "the defendants, jointly and severally, intentionally misrepresented, by commission and/or omission, the value of the subject property, [the] interest of other purchasers in the subject property, and the relationships among and between the defendants." Count seven then alleges in relevant part that "[t]he allegations [in paragraphs 1 through 40 of the substitute complaint] demonstrate that the defendants . . . conspired together to deceive [Stephen Pellet] as to the value of the subject property, to keep the subject property from being shown to prospective purchasers other than . . . Kimberly Kilduff, to conceal from [Stephen Pellet] the relationships between . . . Kimberly Kilduff and the other defendants, and to conceal from [Stephen Pellet] the fact that the defendants were representing both the seller and purchaser of the subject property."[13]

Significantly, both counts five and seven allege that the defendants acted *intentionally*, not negligently, in committing these torts. Moreover, neither claim involves the question of whether the defendants exercised the same degree of care as would a reasonably prudent real estate professional, which is an integral element of a professional malpractice claim. See *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, supra, 311 Conn. 291 (issue whether defendant law firm breached contract or failed to render professional services to "that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profes-

sion" [internal quotation marks omitted]). For the court to have concluded otherwise, therefore, was improper as a matter of law.[14]

### 4

### Count Six

With regard to count six, which alleges negligent supervision against Keller Williams and Ladden, the plaintiff has failed to provide any analysis on this individual count in his brief. Because "[i]t is well settled that [w]e are not required to review claims that are inadequately briefed" and that "[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly"; (internal quotation marks omitted) *Lucarelli* v. *Freedom of Information Commission*, 136 Conn. App. 405, 407 n.1, 46 A.3d 937, cert. denied, 307 Conn. 907, 53 A.3d 222 (2012); we deem the plaintiff's claim, as it relates to count six, inadequately briefed and, thus, abandoned.

### 5

### Count Eight

Finally, we address count eight of the plaintiff's substitute complaint, which alleges violations of CUTPA. The essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) the act complained of was performed in the conduct of trade or commerce; and (3) the prohibited act was the proximate cause of harm to the plaintiff. See *Stevenson Lumber Co.-Suffield, Inc.* v. *Chase Associates, Inc.*, 284 Conn. 205, 213–14, 932 A.2d 401 (2007).

In the present case, count eight alleges in relevant part that "[t]he practices engaged in by the defendants, jointly and severally, as alleged [previously], were deceptive, unethical and unscrupulous . . . offend public policy . . . [and] were conducted in the conduct of the trade or commerce of real estate brokerage, purchase and sales." Significantly, this count incorporates the first forty paragraphs of the substitute complaint.[15] Ultimately, a cause of action brought pursuant to CUTPA requires the plaintiff to go beyond simply alleging that the defendants negligently breached the applicable standard of care that applies to professionals in the field of real estate; it requires the plaintiff to prove that the acts in questions were "unfair or deceptive." For the same reasons discussed in parts I A 1 and 3 of this opinion, we conclude that count eight, likewise, alleges acts against the defendants that can be construed as "unfair or deceptive" in nature. Accordingly, we conclude that the court improperly interpreted count eight to be a claim for professional negligence.[16]

### B

### Expert Testimony

The plaintiff next argues that even if the plaintiff's claims were based upon breaches of professional standards of care, the claims should not have failed for lack of expert testimony because (1) expert testimony is not a categorical requirement to prove the applicable standard of care for a claim of professional negligence, and (2) if expert testimony was required here, it was presented at trial by the defendants. As previously discussed in parts I A 1 and 2 of this opinion, we conclude that some of the plaintiff's allegations were based upon breaches of professional standards of care. To the extent that expert testimony was required to prove such allegations,[17] however, we agree with the plaintiff that expert testimony was, in fact, presented here.

"[W]e note that the [trial] court's determination of whether expert testimony was needed to support the plaintiff's claim of negligence against the defendant was a legal determination, and, thus, our review is plenary." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 373, 119 A.3d 462 (2015). "It is well established that, [i]f the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required. . . . Nevertheless, [a]lthough expert testimony may be admissible in many instances, it is required only when the question involved goes beyond the field of the ordinary knowledge and experience of the trier of fact. . . . The trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." (Citation omitted; internal quotation marks omitted.) *Allison* v. *Manetta*, 284 Conn. 389, 405–406, 933 A.2d 1197 (2007).

Moreover, our Supreme Court "previously [has] determined that a plaintiff may prove the standard of care through the testimony of a defendant. . . . [A]s an expert witness, the defendant is not required specifically to have expressed as an opinion that [she] breached the standard of care in order for the [plaintiff] to prevail. . . . Rather, the [plaintiff] need only have produced sufficient expert testimony to permit the [trier of fact] reasonably to infer, on the basis of its findings of fact, that [the defendant] breached the standard of care." (Citations omitted; internal quotation marks omitted.) *LePage* v. *Home*, 262 Conn. 116, 132, 809 A.2d 505 (2002).

The trial court addressed the issue of expert testimony in the context of the defendants' motion for a directed verdict as follows: "As lay people, we do not know the standards of real estate brokers or their methods. Thus, it is not easily determined what are the demands of proper treatment. It is for this reason that expert testimony is required to define the standard of care or the duty owing from the real estate broker to his or her client and whether that duty has been

breached so that one may reasonably and logically conclude what the standard of care is and whether or not it has been violated . . . . [T]he plaintiff in this case has failed to produce any expert testimony and therefore fails on [his] burden of proof of negligence. Because the underlying complaint in this case is . . . the marketing and undervaluation of the subject property, specifically the recommendation and assessment of the listing price. This knowledge is not one that can be simply discerned from a course of conduct or from some document that sets forth the care that is required under these circumstances. Expert testimony is required . . . and no testimony was offered to establish said standard. . . .

"Although the plaintiff presented an expert in the field of appraisals, this does not satisfy the requirement of an expert to testify as to the standard of care of a realtor in the determination and recommendation of a listing price. The appraiser was not a real estate agent. His appraisal was a retrospective appraisal of the value of the property and did not perform a comparative market analysis." (Internal quotation marks omitted.)

In the present case, although the plaintiff did not present expert testimony from a real estate agent and/or broker[18] regarding the standard of care for these professionals' selection and recommendation of a list price, such testimony was provided by the defendants through Olson and Barbara Fairfield. First, Olson, a licensed real estate agent in Connecticut for more than twenty-three years, testified as to how a professional in the field arrives at a recommended list price. For example, Olson explained how data is obtained through the multiple listing service database and how a comparative market analysis (CMA) is generated for a client's property.

Next, Fairfield, a real estate agent licensed in Connecticut and/or Florida for thirty-five years who also was previously licensed as a broker for nearly thirty years, was tendered by the defendants as an expert witness on their behalf, and the court designated her as such. Fairfield testified that she understood that she was, as counsel stated, "disclosed as an expert witness in this matter to opine as to whether or not the defendants met the applicable standard of care of reasonable real estate professionals with respect to this particular transaction" and that she had reviewed all of the documents and deposition testimony in the present case. Fairfield testified as to how real estate agents generate a CMA for a particular property in order to choose an appropriate list price, stating that the agents "look at the property itself, the condition of the property inside and outside, any cosmetic things that need to be changed or updated and then we look at properties that have sold around the same square footage. We try to do the same number of bedrooms, bathrooms, same

structure, colonial to colonial, for instance. We couldn't compare a colonial to a ranch.

"And so we look at solds and what we try to do with the solds is, we try to stay within a very close area to the subject property and we look at solds. We don't want to go back further than a year before the property date and we definitely don't—we don't have any way to forecast what something would sell after the date. Good comparables will be like kind property, best to about six months in arrears, so we look at those solds because that's what buyers were willing to pay for that property based on its condition. Then we also  .  .  . look at the market. So, we look and see what the competition is at the same time. So, we look at the properties that are out there for sale right now and how they stack up to the subject property, and so we look at those two areas specifically."

Fairfield also testified as to other variables that competent real estate professionals should take into account when determining the list price, such as the age and condition of the property and its features, as well as the time of year at which the property is put on the market. She ultimately opined that, having reviewed Olson's CMA for the property, the $317,900 list price recommended to the plaintiff in September, 2008, was within the range of price "where the property should have its greatest market appeal."

On the basis of the foregoing testimony of Olson and Fairfield, we conclude, contrary to the court's determination, that the jury was provided with expert testimony as to the applicable standard of care required of real estate professionals. Significantly, Olson and Fairfield were "not required specifically to have expressed as an opinion that [the defendants] breached the standard of care in order for the [plaintiff] to prevail," as all that was required was sufficient testimony for the jury "reasonably to infer, on the basis of its findings of fact, that [the defendants] breached the standard of care." (Internal quotation marks omitted.) *LePage* v. *Home*, supra, 262 Conn. 132.

Thus, it of no importance that Olson and Fairfield did not expressly opine that the defendants breached that standard here or that this expert testimony did not specifically come from the plaintiff. See id. Rather, what is significant is that evidence regarding this particular element of professional negligence was, in fact, presented at trial. From the other facts presented in this case, the jury reasonably could infer that the standard of care was breached by the defendants. Because the court improperly concluded that the plaintiff's failure to tender an expert witness resulted in a lack of evidence on the professional standard of care, it improperly directed a verdict in favor the defendants. Accordingly, we reverse the court's judgment.

## II

### SPECIAL FINDING

The plaintiff also claims on appeal that the court improperly found that the underlying action was brought without merit and in bad faith within the meaning of § 52-226a because the two requirements for upholding a bad faith award were not met here.[19] We agree.

Some additional procedural history is necessary to address this claim. Following the court's granting of the defendants' motion for a directed verdict on their behalf, the plaintiff filed with this court an appeal from that judgment. Subsequently, there were two motions for a special finding pursuant to § 52-226a that were filed with the trial court—one on behalf of Kimberly Kilduff, and one on behalf of the remaining five defendants. Following the court's granting of *both* motions for a special finding via a single memorandum of decision filed February 25, 2016, the plaintiff properly filed an amended appeal with this court, assigning as error that February 25, 2016 decision of the trial court. Although that amended appeal did not explicitly reference the underlying judgment for a directed verdict as it applied specifically to Kimberly Kilduff, the plaintiff's preliminary statement of issues for the amended appeal, dated March 31, 2016, clearly shows that he appealed from the court's granting of the special finding as it applied to her.[20] Although Kimberly Kilduff, through counsel, was served with notice of the amended appeal, she did not ultimately participate in the appeal before this court.

"To ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both [1] clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes . . . . [and] [2] a high degree of specificity in the factual findings of [the] lower courts." (Citations omitted; internal quotation marks omitted.) *Rinfret* v. *Porter*, 173 Conn. App. 498, 508–509, 164 A.3d 812 (2017).

As to the five remaining defendants who *did* participate in this appeal, the court's granting of the motion for a special finding pursuant to § 52-226a is tied directly to the merits of its granting of the motion for a directed verdict. Because we conclude that the court improperly granted that motion, as discussed fully in part I of this opinion, the court's special finding pursuant to § 52-226a as to these five defendants must be reversed.

With respect to Kimberly Kilduff, we agree with the plaintiff's argument in his brief that the court did not issue its ruling with "a high degree of specificity in the findings," as is required by our case law. (Internal

quotation marks omitted.) Id., 509. In particular, the court did not analyze the various counts of the substitute complaint as they apply to Kimberly Kilduff,[21] and the court did not specifically indicate, in accordance with its memorandum of decision,[22] at which point in time it should have become clear to the plaintiff that the action against Kimberly Kilduff was, indeed, without merit. Without such necessary findings, we must also reverse the court's special finding pursuant to § 52-226a as it applies to Kimberly Kilduff.

The judgment is reversed as to all defendants except Kimberly Kilduff, the special findings are reversed as to all defendants, and the case is remanded for a new trial as to all defendants except Kimberly Kilduff.

In this opinion the other judges concurred.

[1] We refer in this opinion to Daniel Pellet as the plaintiff and to Stephen Pellet by name.

[2] At trial, the plaintiff did not oppose the court's granting of a directed verdict in favor of Kimberly Kilduff. Therefore, although it is not entirely clear whether the plaintiff now appeals from the court's judgment with respect to that individual defendant, to the extent that he does, none of his claims against Kimberly Kilduff were properly preserved for appellate review, and, thus, we decline to review them. See *State* v. *Diaz*, 94 Conn. App. 582, 586–87, 893 A.2d 495, cert. denied, 280 Conn. 901, 907 A.2d 91 (2006). Accordingly, any reference to the defendants, collectively, in this opinion does not include Kimberly Kilduff. We also note that prior to trial, the plaintiff withdrew the action as against the defendant Ward Kilduff Mortgage Corporation.

[3] General Statutes § 52-226a provides in relevant part: "In any civil action tried to a jury, after the return of a verdict and before judgment has been rendered thereon, or in any civil action tried to the court, not more than fourteen days after judgment has been rendered, the prevailing party may file a written motion requesting the court to make a special finding to be incorporated in the judgment or made a part of the record, as the case may be, that the action or a defense to the action was without merit and not brought or asserted in good faith. . . ."

[4] The plaintiff's memorandum of law in opposition was directed to the defendants' *oral* motion for a directed verdict, which had been presented to the court on July 10, 2015. In addition to his written memorandum of law, the plaintiff also presented oral argument in opposition to the motion.

[5] We note that contrary to the court's assertion, the evidence shows that the sole record buyer in the 2008 sale of the property was Kimberly Kilduff.

[6] Subsequent to the sale of the property, the plaintiff was appointed guardian for Stephen Pellet.

[7] Likewise, Kimberly Kilduff filed a motion for a special finding pursuant to § 52-226a on July 17, 2015, which the court also granted on February 25, 2016.

[8] We note that, in their brief, the defendants categorize the court's recitation of the evidence in support of its ruling as "findings of fact," which are reviewed "only for clear error." Because it would have been improper for the court to make findings of fact in ruling on a motion for a directed verdict; see *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, supra, 115 Conn. App. 693; the notion that we must review the court's recitation of the evidence "only for clear error" is without merit.

[9] We note that a line of cases out of this court has stated that we review a trial court's granting of a motion for a directed verdict for an abuse of discretion. See *Summerhill, LLC* v. *Meriden*, 162 Conn. App. 469, 474, 131 A.3d 1225 (2016). In tracing the origins of this assertion, it is clear that this standard improperly became conflated at one point with the standard of review for challenges to the grant or denial of motions to set aside a verdict. See *Malloy* v. *Colchester*, 85 Conn. App. 627, 632, 858 A.2d 813, cert. denied, 272 Conn. 907, 863 A.2d 698 (2004), citing *Arnone* v. *Enfield*, 79 Conn. App. 501, 505–506, 831 A.2d 260, cert. denied, 266 Conn. 932, 837 A.2d 804 (2003). In any event, because we are bound by the precedent of our Supreme Court as the ultimate arbiter of state law; see *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010); we apply the standard of review that it has held proper

for a challenge to a trial court's granting of a motion for a directed verdict. That standard is plenary. See, e.g., *Curran* v. *Kroll*, supra, 303 Conn. 855.

[10] By so concluding, we do not mean to suggest that this was an appropriate way for the plaintiff to plead. To the extent that count one raised both contractual claims and claims of professional negligence, the defendants could have filed a request to revise in an effort to separate the improperly combined causes of action. See Practice Book § 10-35 ("[w]henever any party desires to obtain . . . [3] separation of causes of action which may be united in one complaint when they are improperly combined in one count . . . the party desiring any such amendment in an adverse party's pleading may file a timely request to revise that pleading").

[11] We note that in its ruling on the motion for a directed verdict, the court made the following conclusory determination: "Which leads me to the final reason for the court's decision to direct the verdict: the plaintiff did not establish [that] any damages actually were incurred. Certainly, no damages were established to substantiate the cause of action for breach of contract or fraud." "The determination of damages involves a question of fact" for the jury; (internal quotation marks omitted) *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 780, 43 A.3d 567 (2012); and, thus, in order for the court to properly grant the motion for a directed verdict on this ground, the evidence on this element must be so weak that it would be proper for the court to set aside a verdict in favor of the other party. See *Curran* v. *Kroll*, supra, 303 Conn. 856. We cannot conclude that this standard was met here. Viewing the evidence in the light most favorable to the plaintiff, the jury could have reasonably concluded that the plaintiff's evidence that he suffered damages, which included a second offer on the property, two days after Kimberly Kilduff's offer, that was for $42,000 more than the first, and testimony from certified real estate appraiser Daniel LaPorte that the market value of the property in October, 2008, was $92,000 higher than the sale price, was sufficient to meet his burden of proof.

[12] On this point, the plaintiff contended elsewhere in the complaint, and incorporated into count four, the following allegations: "[Stephen Pellet] was unaware, and was not informed, that Olson and Jenkins had already discussed selling the subject property, prior to the September 10, 2008 showing, with . . . buyer Kimberly Kilduff"; "[Stephen Pellet] was also unaware, and was not informed, that Kimberly Kilduff was married to Jason Kilduff, who was an associate of Olson and Jenkins and an agent in the same Keller Williams Agency office"; and "[t]he fact that . . . Kimberly Kilduff was also a licensed real estate agent, affiliated with the same Keller Williams Agency office as defendants Jenkins, Olson and Jason Kilduff, was never disclosed to the plaintiff."

[13] With regard to the specific allegation that the defendants failed to inform the plaintiff of Olson's and Jenkins' dual representation of both him and Kimberly Kilduff in the sale of the property, which was incorporated into all eight counts of the substitute complaint, the court stated the following in its ruling on the motion for a directed verdict: "General Statutes § 20-325d sets forth the requirement that . . . whenever any real estate broker or real estate salesperson intends to act as an agent for the prospective purchaser he shall disclose such intended representation to the seller at the beginning of the first personal meeting with the seller. General Statutes § 20-325g states that there is a conclusive presumption that a person has been given informed consent to a dual agency relationship with the real estate broker if that party executes a written consent.

"First, the statute, § 20-325d, does not state that the transaction fails for the lack of any dual agency agreement. Second, there was never any allegation of a violation of this statute, and even if the court stretched this even further and accepted the plaintiff's argument that this is negligence per se, the violation of a statute has to be proven to be a substantial factor in causing the plaintiff's damages before the plaintiff can recover. There is not a scintilla of evidence to indicate that the failure to have such a document signed was a substantial factor in the plaintiff's damages."

"Ordinarily, it is a question of fact whether the negligence of a defendant was the proximate cause of a plaintiff's injuries. . . . The test is whether the defendant's conduct was a substantial factor in causing the plaintiff's injuries." (Citation omitted.) *Ferndale Dairy, Inc.* v. *Geiger*, 167 Conn. 533, 538, 356 A.2d 91 (1975). In the present case, there was evidence presented, through the parties' joint stipulation and through the plaintiff's testimony, that the dual agency was never disclosed to Stephen Pellet. Accordingly, the jury reasonably could have inferred from this evidence that, had the dual agency been disclosed, the plaintiff would have chosen another agent/

broker who did not have divided loyalties, and that that new agent/broker, in turn, would have obtained a higher sales price for the property. Thus, viewed in the light most favorable to the plaintiff, there was enough evidence at trial that the question of causation should have gone to the jury, and the issue was, therefore, improper for the court to resolve in the context of a motion for a directed verdict.

[14] We note that the court also directed the verdict in favor of the defendants on count seven specifically on the ground that "the plaintiff has not met [his] burden of proof to sustain such a claim or to support the claim that he suffered substantial harm." "The party claiming fraud . . . has the burden of proof. . . . Whether that burden has been met is a question of fact . . . ." (Internal quotation marks omitted.) *Duplissie* v. *Devino*, 96 Conn. App. 673, 680, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006). Viewing the evidence in the light most favorable to the plaintiff, we conclude that the jury could have reasonably determined that the elements of conspiracy to defraud were proven here. More specifically, evidence was presented at trial that the defendants all were professionally affiliated with Keller Williams at some point in time and had personal relationships with each other; that Olson and Jenkins showed the property to Kimberly Kilduff and Jason Kilduff while the property was still listed as "temp" status, thus prohibiting other real estate agents from seeing the property or presenting offers on it on behalf of their clients; that Olson and Jenkins never discussed their role as dual agents with the plaintiff; and that Jason Kilduff served as the listing agent and Keller Williams as the broker in the resale of the property in 2009. On the basis of this evidence, the jury reasonably could have inferred that because the defendants were concerned with helping their other client, the purchaser, obtain the property at the lowest price possible, as well as with lining their own pockets via a second, future sale once the property had been flipped by the Kilduffs, this affected their representation of the plaintiff in the 2008 sale of the property and caused the alleged damages at issue here.

[15] In the first forty paragraphs of the substitute complaint, the plaintiff alleges that the defendants acted improperly in some of the following ways that do not directly encompass the list price of the property: Jenkins and Olson showed the house to Kimberly Kilduff without written permission that the property could be moved from "temp status" to "active," and in derogation of Stephen Pellet's express instructions not to show the house until it was cleaned; none of the defendants informed Stephen Pellet of Olson's and Jenkins' dual representation of both Stephen Pellet and Kimberly Kilduff prior to the sale of the property, nor was a written dual agency disclosure notice and consent agreement executed; the defendants failed to disclose that there were other offers on the property; and the deceptive practices of some or all of the defendants working in concert with one another "deprived and excluded all other prospective buyers from even bidding on the subject property before the September 10, 2008 purchase contract was signed."

[16] The court also directed the verdict in favor of the defendants on count eight specifically on the ground that "the plaintiff premises his allegation of a violation of CUTPA on the purported breaches of unspecified professional standards of care and the allegedly artificially low listing price recommendation and subsequent sale of the home. CUTPA requires that the defendant must have engaged in unfair or deceptive acts in the conduct of any trade or commerce. In the absence of such unfair or deceptive acts, in this case, breach of professional standards of care with the intent to defraud, the claim cannot be found in favor of the plaintiff."

In our review of count eight, the plaintiff's CUTPA claim clearly incorporates a myriad of allegations of unfair or deceptive acts, as set forth in paragraphs 1 through 40 of the substitute complaint, that do not all necessarily implicate a professional standard of care. See footnote 15 of this opinion. Accordingly, we reject this conclusion of the court.

[17] The plaintiff has failed to provide any analysis for his broad assertion that expert testimony was not required in the present case because "the questions presented in each of [his] eight counts did not require expertise 'beyond the field of . . . ordinary knowledge and experience.' " Therefore, because it is inadequately briefed, we decline to reach the merits of this argument. See *Lucarelli* v. *Freedom of Information Commission*, supra, 136 Conn. App. 407 n.1.

[18] The plaintiff argues in his brief that the testimony of Daniel LaPorte, a certified residential real estate appraiser who testified on the plaintiff's behalf, did, in fact, satisfy any requirement of expert testimony as to the standard of care of a realtor and/or broker in the determination and recom-

mendation of a list price. Because we determine that expert testimony was adequately provided by Olson and Fairfield, we need not decide whether LaPorte's testimony also satisfied this requirement.

[19] The plaintiff also argues, with respect to this claim, that the procedural requirements of the statute must be met before the trial court can make a § 52-226a finding; they were not met here, he argues, because the action was tried to a jury and, thus, the special findings had to have been made "after the return of a verdict and before judgment has been rendered thereon," which did not occur. General Statutes § 52-226a. Because we reverse the court's § 52-226a findings on other grounds, we need not address the merits of this argument.

[20] Specifically, the plaintiff presented the following issue: "Did the trial court err in making a finding pursuant to General Statutes § 52-226a when the [plaintiff's] causes of action both had merit and were brought in good faith because [Kimberly] Kilduff was a licensed real estate agent, affiliated with the Keller Williams Agency, who represented [Stephen Pellet] as [his] real estate agent, suggesting a conflict of interest that rose to the level of negligent misrepresentation, intentional misrepresentation, and conspiracy to defraud?"

[21] To the extent that the court supported its special finding as to Kimberly Kilduff by concluding that "the plaintiff offered *no* evidence to prove"; (emphasis in original); his allegation that Kimberly Kilduff was a real estate agent affiliated with Keller Williams, we note that Kimberly Kilduff testified at trial that she was a licensed real estate agent twelve years prior and that she carried her license with Keller Williams. (Emphasis in original.)

[22] The court concluded in its memorandum of decision that "[w]hether or not the plaintiff had probable cause to bring the action against [Kimberly] Kilduff at the commencement of the suit is questionable. However, once she provided him with a full package of documents sometime in October, 2012, through discovery, and participated in numerous pretrial[s] over the four years the case was pending, there would have been sufficient evidence to indicate that his claims were totally without merit and unwarranted."

---